[L.A. No. 30891. Sept. 26, 1978.]

HAROLD CORWIN et al., Plaintiffs and Appellants, v.
LOS ANGELES NEWSPAPER SERVICE BUREAU, INC., et al.,
Defendants and Respondents.

## COUNSEL

Darling, Hall, Rae & Gute and John R. Shiner for Plaintiffs and Appellants.

Robert F. Tyler, Ball, Hunt, Hart, Brown & Baerwitz, Albert H. Ebright, O'Melveny & Myers, Bertrand M. Cooper and Everett B. Clary for Defendants and Respondents.

## OPINION

**TOBRINER, J.**—Seven years ago in *Corwin v. Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842 [94 Cal.Rptr. 785, 484 P.2d 953] (*Corwin I*), we reversed a summary judgment against plaintiffs Harold Corwin and Allen Barr (Statewide) and held that they were entitled to a trial in their antitrust suit against defendant Los Angeles Newspaper Service Bureau, Inc. (Bureau) and forty of its member newspapers. Statewide did not prevail in the trial below, and now appeals from the judgment in favor of defendants.

Statewide essentially contends that the trial court did not follow the mandate of *Corwin I* to find that the written agreement between the Bureau and its member newspapers was an unreasonable restraint of trade. As we explain, however, Statewide itself misconstrues *Corwin I* and the requirements of the antitrust laws. *Corwin I* merely held that Statewide had raised triable issues of fact; upon trial, plaintiff failed to establish that the agreement between the Bureau and its members pursued as its purpose, or effectuated, a restraint of trade or an unreasonable restraint of trade. The judgment of the trial court must therefore be affirmed.

### Factual Background

Statewide, a partnership formed in 1966, is in the business of processing nonjudicial foreclosures of real property for its trustee clients. Statewide solicits business from trustees and charges them fees for posting notices of sale on properties, conducting sales, and arranging for newspaper publication of notices of default and notices of trustee sales.

Statewide generally sends copies of such notices to designated newspapers, which charge Statewide for the price of publication. Some newspapers by agreement allow Statewide a commission which over the years has ranged between 10 and 30 percent.

The Bureau is a newspaper representative in the field of public notice advertising.[1] Its membership consists of 111 community newspapers published in Los Angeles County. Membership is open to any newspaper published in Los Angeles County which by decree of the superior court has been adjudicated a newspaper of general circulation. The Bureau was organized in 1934 for the purpose of helping community newspapers solicit, publish, and compete for public notice advertising. Until the formation of the Bureau, such advertising had been monopolized to the exclusion of community newspapers by Consolidated Printing and Publishing Company.

The Bureau works with the advertiser to make sure a notice is properly phrased in accordance with applicable statutes and to ascertain which newspapers are qualified to carry the particular advertisement. It proofreads the advertisement and checks legal descriptions and affidavits of publication. The Bureau bills the advertisers on behalf of its members and remits the proceeds, minus its commission, to each newspaper. If an advertiser fails to pay, the Bureau absorbs the loss.

In addition to its services in processing legal advertisements, the Bureau also acts as a representative for its member newspapers in the area of public relations and public law. It maintains for its members a compendium of the more than 2,000 statutes governing the various types of legal advertisements, and renders expert assistance to its members in complying with those statutes. It acts as a lobbyist for newspapers in seeking changes in legal publication statutes; it also contributes support to other newspaper associations representing publishers on a statewide level.

Each Bureau member newspaper executes a representation agreement designating the Bureau its representative in soliciting and servicing all classes of public notice advertising.[2] Under paragraph Eighth of this

---

[1]Public notice advertising includes advertising of such items as notices of trustee sales, certificates of fictitious names, probate notices, tax sale lists, solicitations for bids for government contracts and other notices required by law.

[2]The representation agreement has been modified over the years several times. With one exception (see *infra,* fn. 4), these modifications are not here relevant.

agreement the member agrees to pay the Bureau a 15 percent commission on each legal notice published by the newspaper, whether or not the particular advertisement was placed by the Bureau.[3] In return, the agreement provides that each member shall own one share of stock in the Bureau and shall be entitled to an annual pro rata distribution of the Bureau's net profits. Each member is also entitled to make use of all services performed by the Bureau.

Each member reserves the right to withdraw any class of legal advertising from the agreement, in which case the Bureau receives no commission for the excluded class. The agreement provides in paragraph Second, however, that if the newspaper exercises its withdrawal privilege, it waives the right to participate in the annual distributions of the Bureau's net profits.[4]

Statewide commenced the instant action against the Bureau and 40 of its members charging that the Bureau and defendant publishers entered into the representation agreements as part of a common plan and conspiracy violative of the Cartwright Act. (Bus. & Prof. Code, § 16700 et seq.) Statewide contended that the agreements constitute a combination to restrict trade in the soliciting and servicing of the publication of notices of trustee sales in violation of Business and Professions Code sections

---

[3] Paragraph Eighth provides in relevant part: "The BUREAU shall and it is hereby authorized to deduct, as compensation for its services, fifteen (15%) per cent of all sums collected for the account of the PUBLISHER . . . . In the event any sums are paid directly to the PUBLISHER for any advertisements covered by this agreement, the PUBLISHER shall render a true and correct account thereof to the BUREAU and shall pay to the BUREAU within thirty days after receipt of said sums, a sum equal to fifteen (15%) per cent of the amount paid to the PUBLISHER."

[4] Paragraph Second provides in relevant part: "The PUBLISHER hereby retains the services of the BUREAU as representative of the PUBLISHER for soliciting and servicing of all legal advertising . . .; provided, however, the PUBLISHER reserves the right to withdraw, at any time by notification in writing to the BUREAU, from the terms of this agreement, the following classes of legal advertising: _____. [¶] In the event the PUBLISHER exercises the withdrawal privilege herein contained, PUBLISHER agrees to and does hereby waive during the period of such withdrawal the right to participate in the distributions and/or credits contemplated under paragraph Ninth hereof." Paragraph Ninth provides for the annual pro rata distributions of the Bureau's profits as discussed above.

Following *Corwin I*, the Bureau amended paragraph Second to state that if the member exercised its withdrawal right it waived only that portion of the annual participation credit referrable to the advertising withdrawn.

16720 and 16726.[5] In addition to treble damages plus attorney's fees and costs, Statewide sought an injunction forbidding defendants from enforcing or complying with their representation agreements and a declaration that the agreements are void as contrary to public policy.[6]

The trial court initially granted summary judgment in favor of defendants. We reversed this judgment in *Corwin I*. Because the instant appeal relies on our findings and holdings in *Corwin I*, an extended discussion of that case commands our attention before we examine the findings of the trial judge in the ensuing trial.

*Corwin I.*

In *Corwin I*, plaintiffs appealed from a summary judgment in favor of defendants. The narrow issue before us, therefore, was "whether . . . the declaration[s] filed below disclose[d] a triable issue of fact." (4 Cal.3d at p. 852.)

The record before us in *Corwin I* was limited to the declarations of the parties and to the representation agreement. Taken alone, the representation agreement provided for the payment of an across-the-board commission on all public notice advertising published by the member newspaper whether or not the particular advertisement was placed by the Bureau. Although each member had the right to withdraw a class of advertisement from the agreement, the agreement apparently provided that if such withdrawal privilege were exercised, the member waived all right to participate in the annual distribution of the Bureau's net profits. The limited record before us suggested that Bureau newspapers refused to pay Statewide a commission because of the across-the-board commission arrangement: "Members are understandably reluctant to pay the double commission which would result if they also paid Statewide for the advertising it furnishes." (4 Cal.3d at p. 850.)

---

[5]Section 16720 provides in relevant part: "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes: [¶] (a) To create or carry out restrictions in trade or commerce." Section 16726 provides: "Except as provided in this chapter, every trust is unlawful, against public policy and void."

[6]Statewide also argued at trial that paragraph Second itself was a tying arrangement constituting a per se violation of sections 16720 and 16726. The trial judge found, however, that no tying arrangement existed. Statewide does not challenge this finding on appeal.

We explained that Statewide would prevail in its appeal from the summary judgment if it demonstrated "not only that the agreements 'create or carry out restrictions in trade' (§ 16720, subd. (a)) but also that such restrictions are unreasonable. [Fn. omitted.]" (4 Cal.3d at p. 853.)

We found that paragraphs Second and Eighth of the representation agreements might involve restraints of trade. Paragraph Eighth made it "economically infeasible for the Bureau's member newspapers to pay independent agencies such as Statewide the normal 15 percent advertising commission. . . . [N]o newspaper could afford consistently to pay a total of 30 percent commissions (15 percent to the Bureau and 15 percent to the independent agency)." Thus Statewide might be "forced either to accept a reduced profit level or to charge its clients, the trustees, a higher fee. The more Statewide is compelled to charge its clients, the less able it will be to compete for their business. . . . Thus, the effect of paragraph Eighth is to reduce the profit margin and competitive strength of independent agencies such as Statewide." (4 Cal.3d at p. 854.)

Paragraph Second of the agreement similarly appeared to impose a restraint of trade. As we noted, "By prohibiting *all* participation in the Bureau's distribution of profits if a member withdraws any class of advertising from the agreement, this provision severely penalizes a member newspaper which wishes to have a different representative or none at all for specified classes of legal advertising." (4 Cal.3d at p. 854.)

Having determined from the record before us that the representation agreements between the Bureau and its members apparently constituted a restraint of trade, we explained that the agreements violated the Cartwright Act unless shown to be reasonable. We explained that in determining whether a restriction is reasonable, " 'the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, are all relevant facts.' (*Chicago Board of Trade* v. *United States* (1918) 246 U.S. 231, 238.) . . . Whether a restraint of trade is reasonable is a question of fact to be determined at trial." (4 Cal.3d at pp. 854-855.)

We concluded that Statewide was entitled to a trial to determine whether the Bureau and its members had combined and conspired in restraint of trade.[7]

*Findings of the Trial Court*

After a 12-day trial in which 19 witnesses testified and 92 exhibits were received in evidence, the trial court entered judgment for defendants. The trial court supported its judgment with 36 detailed findings of fact.

The trial court found that the representation agreement *did not in fact restrain trade.* Although the wording of paragraph Second provided for forfeiture of the annual distribution of profits if a member newspaper excluded a class of advertising from the agreement,[8] in actual practice no member had ever been penalized for excluding advertising from the agreement.[9] Thus, since the right to exclude advertising was "free and unfettered," the trial court found that the across-the-board commission arrangement of paragraph Eighth did not operate as a restraint of trade.[10]

While the trial court concluded that paragraphs Second and Eighth of the representation agreement did not constitute a restraint of trade, the court also expressly found that *if the agreement did constitute a restraint, such a restraint was reasonable* "under all the facts and circumstances." The across-the-board commission, the court found, was the only practical

[7]We also determined that Statewide had presented a triable issue of fact as to whether paragraph Second constituted an illegal tying arrangement (4 Cal.3d at pp. 856-857). Statewide, however, does not challenge the trial judge's determination that no tying arrangement existed.

[8]In 1972 this provision was eliminated from the representation agreement. (See fn. 4, *ante.*)

[9]The trial court found that "[t]hroughout the long history of the Bureau many members have excluded various kinds and classes of advertising from the agreement. The means of exclusion have varied—some formal, others informal. The evidence is clear and convincing that no penalty of any kind whatsoever has been assessed by the Bureau or any of its members to any member for excluding any class or classes of advertising from the agreement and that the annual participation credit has been paid to each and every member of the Bureau regardless of whether that member had withdrawn or excluded any class or classes of advertising from the agreement."

[10]Moreover, as the trial court found, "STATEWIDE never made any effort to represent any newspaper published by the defendants in this case from 1966 to the present in the business of soliciting and servicing public notice advertising. STATEWIDE was not forced to offer representation for all public notice advertising. The withdrawal clause in the Representation Agreement permitted STATEWIDE to offer representation with regard to individual classes of such advertising."

way to compensate the Bureau for its services. The commission provided incentive to the Bureau to engage in a maximum sales effort to promote advertising rather than itself; eliminated disputes over the source of and credit for a particular notice; and offered the fairest method of compensating the Bureau for its public relations and lobbying activities: "No practical way exists to make separate specific charges . . . for these additional activities."

 Appealing from the judgment below, Statewide contends that the trial judge erred by (1) failing to find that paragraph Second of the representation agreement on its face was a restraint of trade; and (2) failing to find that the across-the-board commission arrangement in paragraph Eighth was an unreasonable restraint of trade.[11] As we explain, however, Statewide misconstrues the import of *Corwin I.* The undisputed findings of the trial judge clearly establish that neither paragraph Second nor Eighth constitutes an unreasonable restraint of trade.

 1. *Paragraph Second of the representation agreement does not constitute a restraint of trade.*

Statewide does not challenge the trial court's finding that paragraph Second has never been applied to penalize a member newspaper for excluding a class of advertising from the agreement. Statewide contends, instead, that the wording of paragraph Second itself constitutes a restraint of trade regardless of the actual practice of the Bureau and its members. To support this contention, Statewide argues that the trial judge ignored our conclusion in *Corwin I* that "[s]ince the agreements between the Bureau and its member newspapers constitute a restraint upon trade, they violate the Cartwright Act unless they are shown to be reasonable." (4 Cal.3d at p. 854.) Statewide also maintains that our opinion in *Corwin I*

---

[11]Statewide also challenges the trial court's finding that the "[r]elevant geographic market is limited to the State of California" and that the "relevant product is the services of a newspaper representative in the field of public notice advertising." Statewide argues that the relevant geographic market must be limited to the County of Los Angeles and that the relevant line of commerce must be limited to notices of trustee's sales. In *Corwin I* we explained that the definition of the relevant market or line of commerce presents a question of law and fact. (4 Cal.3d at p. 855.) Statewide does not explain how the trial court's definition fails as a matter of law. Moreover, the trial court's finding is supported by substantial evidence on the record. Although the Bureau's membership is limited to the County of Los Angeles, over 40 percent of Statewide's files involved property located outside Los Angeles. As to "relevant product," the evidence shows that Statewide neither attempted to represent newspapers for trustee sale notices or public notice advertising generally nor performed any substantial services for the newspapers.

compels the conclusion that actual practice, although relevant, is not conclusive in determining the existence or nonexistence of a restraint.[12]

Statewide's first argument ignores the procedural posture of *Corwin I* and completely undercuts the fact-finding function of the trial court. As we explained in *Corwin I,* our role in reviewing the trial court's summary judgment was limited to a determination of whether the losing party had presented any facts giving rise to a triable issue. (4 Cal.3d at p. 851.) Required to construe the affidavits of the moving party strictly and those of the opponent liberally, we found on the basis of the limited record before us that a triable issue of fact arose as to whether or not there was an unreasonable restraint of trade.

The record before us did not, however, indicate how paragraph Second was actually interpreted and applied. For this reason we merely noted the Bureau's tardy offer of proof concerning the interpretation and application of that paragraph, indicating our reluctance to consider a contention which was not supported by facts in the record before us and which had been raised at the eleventh hour; we specifically invited defendants to attempt to prove this contention at the subsequent trial.

Indeed, after a full presentation of the evidence, the trial court did find the facts to be different from those which we were required to assume for purposes of reviewing the summary judgment in *Corwin I.* The undisputed findings of the trial court were that defendants had never assessed a penalty against a member newspaper which excluded a class of advertising from its agreement. Since the right to exclude a class of advertising was "unfettered," the trial court concluded that in fact no restraint of trade resulted from paragraph Second.[13]

---

[12]Statewide relies in particular on our footnote 3, which states, "In its supplemental brief filed in this court, the Bureau, for the first time herein, contends that while the literal language of the contract appears to dictate the total waiver of any right to profits as stated above, the actual practice has been to allow member newspapers which have excluded certain classes of legal advertising from their contract to participate in the distribution of net profits to the extent of the commissions they paid to the Bureau on nonexcluded classes. Since no such facts appear in the record, *we cannot now consider this contention. However, to the extent that such facts are relevant, they may be proved at trial.*" (Italics added.) (4 Cal.3d at p. 849, fn. 3.)

[13]The evidence presented at trial demonstrated that members could exclude classes of advertising from the agreement at any time by letter or telephone call or even by a refusal to pay for a class of advertising. The 14 member-newspaper representatives who testified at the trial stated that they knew about the withdrawal privilege. Their testimony indicated that nearly all member newspapers excluded at least one class of advertising from the agreement.

Thus the trial court in effect found a different contract than the one we supposed in *Corwin I*. The consistent interpretation of the contract over a long period of time so as not to provide for a penalty if a member newspaper withdraws a class of advertising from the agreement amounts to a practical construction of the contract. The wording of paragraph Second (see fn. 4, *ante*) is not so explicit as to foreclose this interpretation. We have explained that in interpreting contracts, "even if it be assumed that the words standing alone might mean one thing to the members of this court, where the parties have demonstrated by their actions . . . that to them the contract mean[s] something quite different, the meaning and intent of the parties should be enforced." (*Crestview Cemetery Assn.* v. *Dieden* (1960) 54 Cal.2d 744, 754 [8 Cal.Rptr. 427, 356 P.2d 171].)

Nevertheless, plaintiffs argue that the wording of an agreement, divorced from its interpretation or application by the parties, can constitute a restraint of trade. ■ We are unable to discover a single case which holds that the mere wording of a written agreement, regardless of its interpretation or application, or its object and effect, constitutes a restraint of trade. Indeed, as we explain, the thrust of the antitrust laws completely negates this contention.

■ The basic purpose of the antitrust laws is to prevent undue restraints upon trade which have a *significant effect* on competition. (*Apex Hosiery Co.* v. *Leader* (1940) 310 U.S. 469, 483-495 [84 L.Ed. 1311, 1316-1324, 60 S.Ct. 982, 128 A.L.R. 1044]; *Appalachian Coals, Inc.* v. *United States* (1933) 288 U.S. 344, 359 [77 L.Ed. 825, 829, 53 S.Ct. 471].)[14] A contract, combination, or conspiracy is an illegal restraint of trade if it constitutes a per se violation of the statute[15] or has as its *purpose* or *effect* an unreasonable restraint of trade. (*Cities Service Oil Company* v. *Coleman Oil Company, Inc.* (1st Cir. 1972) 470 F.2d 925, 930-931, cert. den. (1973) 411 U.S. 967 [36 L.Ed.2d 688, 93 S.Ct. 2150].) The determination of the existence of such an illegal restraint of trade turns upon findings of fact and involves "weigh[ing] all of the circumstances of a case." (*Continental T. V., Inc.* v. *GTE Sylvania Inc.* (1977) 433 U.S. 36,

[14]Since sections 16720 and 16726 of the Cartwright Act were patterned after the Sherman Act (15 U.S.C. § 1 et seq.), decisions under the latter act apply to the former. (*Corwin I*, 4 Cal.3d at p. 852.)

[15]Examples of per se violations include price fixing agreements (*U. S.* v. *Socony-Vacuum Oil Co.* (1940) 310 U.S. 150 [84 L.Ed. 1129, 60 S.Ct. 811]) and tying arrangements (*Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1 [2 L.Ed.2d 545, 78 S.Ct. 514]). Statewide makes no claim of a per se violation in this appeal.

49 [53 L.Ed.2d 568, 580, 97 S.Ct. 2549].) Moreover, in reaching this determination, "[r]ealities must dominate the judgment" (*Appalachian Coals, Inc.* v. *United States, supra,* 288 U.S. 344, 360 [77 L.Ed. 825, 830]): "It is not the form of the combination or the particular means used but the result to be achieved" that the antitrust law condemns. (*American Tobacco Co.* v. *U. S.* (1946) 328 U.S. 781, 809 [90 L.Ed. 1575, 1594, 66 S.Ct. 1125].)

 In the present case, the trial court found that paragraph Second of the representation agreement had *neither the purpose nor the effect* of restraining trade. The trial court had the benefit of a 12-day trial and extensive exhibits. It made detailed findings of fact concerning every aspect of the public notice advertising business, the business practices of the Bureau, the relationship between the Bureau, the Bureau's members and competitors, and the history of the agreements between the Bureau and its members.[16] These findings are not disputed, and they are supported by substantial evidence. The trial court correctly concluded, after examining all the facts and circumstances of the case, that paragraph Second of the agreement did not constitute a restraint of trade at all. We cannot say that the court erred as a matter of law in its conclusion.

 2. *The trial court's findings that paragraph Eighth of the representation agreement was not a restraint of trade, or, if a restraint of trade, not an unreasonable restraint, are supported by substantial evidence.*

Statewide also contends that paragraph Eighth, which provides for across-the-board commissions, is an illegal restraint of trade. Statewide claims that the trial court mistakenly assumed that paragraph Eighth

[16]In sum, the trial court found that the Bureau was originally organized in response to the monopolization of the public notice advertising business by a corporation which excluded community newspapers from the advertising. The underlying principle of the Bureau since its creation, the trial court found, has been to help community newspapers compete for public notice advertising. This policy, the trial court found, results in the publication of notices in the newspaper most likely to be effective. The trial court concluded that the Bureau substantially benefits both the public and the newspaper industry.

Moreover, the trial court found no evidence of any artificial barrier or restraint to competition. Representatives of member newspapers who testified at the trial stated that their agreement with the Bureau did not restrain them from dealing with Statewide or any other independent organization. Representatives of newspapers who did not pay Statewide a commission testified without exception that they paid no commission because Statewide did not provide them with any valuable services, and not because of any arrangement with the Bureau.

could not be an illegal restraint of trade if paragraph Second, providing for withdrawal for classes of advertising, were not a restraint of trade; Statewide claims that *Corwin I* treated each paragraph of the agreement as an independent illegal restraint.

In *Corwin I,* we explained that paragraph Eighth appeared to require a member newspaper to pay a commission to the Bureau even if the advertising were placed by an independent agency such as Statewide. Although the agreement gave a member newspaper the right to withdraw a class of advertising from the agreement, in *Corwin I* we interpreted paragraph Second to provide for a prohibitive penalty if that withdrawal right were exercised. Thus, we explained, since no newspaper would willingly pay a double commission, the effect of paragraph Eighth appeared to be to "reduce the profit margin and competitive strength of independent agencies such as Statewide." (4 Cal.3d at p. 854.) We concluded that Statewide had presented a triable issue of fact as to whether the commission arrangement constituted an unreasonable restraint of trade.

The trial court found, however, that the right to withdraw a class of advertising from the agreement was "unfettered"; therefore newspapers could, by excluding trustees' sales, accept Statewide's notices without paying a double commission.[17] Statewide was *not* in fact forced to reduce its profit level or charge its trustee clients a higher fee or offer representation for all types of public notice advertisements. Statewide did not demonstrate below, and does not explain here how the commission arrangement operated as a restraint of trade in light of the fact that member newspapers were free at any time to withdraw a class of advertising from the agreement.[18]

Moreover, although the trial court concluded that paragraph Eighth did not operate as a restraint of trade, it nevertheless made detailed findings as to the *reasonableness* of the commission arrangement. As the court found, "The 15% commission provision in the Representation Agreement . . . is a reasonable provision. It operates fairly for the

[17]Indeed testimony at trial suggested that a newspaper could withdraw "all advertising placed by Statewide" from the representation agreement.

[18]Particularly damaging to Statewide's case are the undisputed findings that, although Statewide knew of the withdrawal provision of the representation agreement, it never proposed to any Bureau newspaper to serve as the newspaper's representative for servicing trustee notices, and that Statewide did not perform any services for the newspapers.

newspaper and its representative. Such a commission arrangement provides for compensation on the basis of actual benefits received by the newspaper, . . . and furnishes a necessary and reasonable incentive to the Bureau to engage in a maximum sales effort to sell, promote and protect public notice advertising as opposed to selling the Bureau itself. . . . [¶] . . . The across-the-board commission arrangement is the only reasonable and practical way to compensate the Bureau for these services in a manner which is fair to the Bureau and to its members." Thus the trial court determined that even if paragraph Eighth, together with paragraph Second of the agreement, constituted an agreement in restraint of trade, the agreement did not effect an unreasonable restraint, and therefore did not violate the Cartwright Act.

As we explained above, *Corwin I* did not purport to find facts or require the trial court to ignore the evidence presented to it. Statewide neither disputes the trial court's factual findings nor explains how the commission arrangement operates as a restraint of trade or an unreasonable restraint of trade. Indeed, since Statewide apparently made no effort to offer a competitive service to the Bureau newspapers, we have difficulty in imagining how the agreement damaged Statewide. In sum, Statewide has not demonstrated error in the court below.

*Conclusion.*

*Corwin I* mandated the trial court to find the facts. After an extensive trial, the trial court found that the representation agreement neither restrained nor unreasonably restrained trade. Statewide does not question the factual basis of these findings. Since Statewide failed to establish by a preponderance of the evidence that either the purpose or the effect of the representation agreement was to restrain trade or unreasonably to restrain trade, we affirm the judgment of the trial court.[19]

Bird, C. J., Mosk, J.; Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.

---

[19]Because we affirm the judgment for defendants, it is unnecessary to consider the claim of defendant Copley Press, Inc., that it was entitled to a dismissal because of plaintiffs' failure to serve notice to them within three years after the commencement of this action.